UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————x

In re:                                                     06-Civ-5605 (CM)
                                                           06-Civ-5606 (CM)
ST. CASIMIR DEVELOPMENT CORP.,                             06-Civ-5607 (CM)

                                       Debtor.             On Appeal from the
————————————————————————x                                 United States Bankruptcy
                                                           Court for the Southern
                                                           District of New York

                                                           05-24239 (ASH)


**DECISION AND ORDER REVERSING THE BANKRUPTCY COURT'S GRANTING
OF ALLIANT'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY AND
INJUNCTIVE RELIEF IN THE RELATED ADVERSARY PROCEEDING**


McMahon, J.:

        Appellant St. Casimir Development Corporation ("Debtor") seeks review of the United

States Bankruptcy Court's order dated June 6, 2006, granting Appellees Alliant Tax Credit XIV,

Inc. ("Alliant XIV") and Alliant Tax Credit Fund XIV, Ltd. ("Alliant Fund XIV" and, jointly

with Alliant XIV, "Alliant") relief from the automatic stay in the Debtor's bankruptcy

proceeding, and injunctive relief in a related adversary proceeding to effectuate Alliant's pre-

petition removal of the Debtor as general partner of 11-23 St. Casimir Avenue, L.P. (the

"Partnership").

        Prior to the Debtor's bankruptcy proceeding, the Debtor served as general partner in a

limited partnership with Alliant.  The Partnership's goal was to construct and operate a low-

income senior housing complex in Yonkers, New York.  Under the Partnership Agreement, the

Debtor was responsible for paying the monthly mortgage payments associated with the purchase

of the housing complex property.  After the Debtor fell behind in its mortgage payments and

defaulted on other aspects of the Partnership Agreement, Alliant served the Debtor with two notices of default, thereby giving the Debtor fifteen days to cure the alleged defaults.  Following the fifteen day cure period, Alliant served a notice of intent to remove on the Debtor.  Upon the Debtor's subsequent promise to pay the mortgage balance, Alliant sent a letter to the Debtor indicating that Alliant would forbear from removing the Debtor as general partner until further notice was given.  Four months later, after the Debtor still had not cured the mortgage default, Alliant sent a second letter notifying the Debtor that it was being removed as general partner effective immediately.  Five days after sending this removal letter, Alliant filed a complaint in federal court seeking, *inter alia*, the court-ordered removal of the Debtor as general partner.  The Debtor filed its Chapter 11 bankruptcy petition two days later, and the adversary proceeding was subsequently transferred to the bankruptcy court.

In granting Alliant's motions, the bankruptcy court found that Alliant had properly served the initial notice of default and notice of intent to remove, that the subsequent forbearance letter did not invalidate either of these notices, and that the final removal letter was therefore valid.  Accordingly, the bankruptcy court granted Alliant relief from the automatic stay and enjoined the Debtor from acting as a general partner in the Partnership.

On appeal, the Debtor maintains that the bankruptcy court erred in granting Alliant relief because the forbearance letter effectively waived Alliant's rights to remove the Debtor pursuant to its earlier default and intent to remove notices, and Alliant therefore had to start the removal process anew.  The Debtor further claims that Alliant did not strictly comply with the Partnership Agreement's notice provisions when Alliant served the forbearance letter and removal letter on the Debtor.  Last, because the Debtor claims that it still maintains an interest in the Partnership,

the Debtor contends that it may assume the Partnership Agreement under 11 U.S.C. § 365, and cure any remaining defaults.

For the reasons stated below, the bankruptcy court's decision is reversed.

## I.  Issues on Appeal

The issues on appeal are 1) did the bankruptcy court err in finding that Alliant had properly served a notice of default, a notice of intent to remove, and a removal letter on Debtor in accordance with the Partnership Agreement provisions, and that Alliant's forbearance letter did not waive Alliant's right to remove the Debtor as General Partner pursuant to these notices, and 2) if the answer to the first question is yes, does the Debtor currently possess a sufficient interest in the Partnership such that the Debtor may assume the Partnership Agreement under 11 U.S.C.  § 365 in the Debtor's subsequent bankruptcy proceeding.

## II.  Background

St. Casimir Development Corporation ("Debtor" or "Appellant") is a General Partner of 11-23 St. Casimir Avenue, L.P. (the "Partnership"), a limited partnership formed in 1998 for the purpose of providing low-income housing through the construction, operation and leasing of a 107 unit senior housing complex in Yonkers, New York (the "Complex").  (Debtor's Designation of Record and Statement of Issues on Appeal ("Appellate Record"[1]) D-3, ¶¶ 5-7 and Ex. A at § 2.5.)  Until the Partnership was amended in 2001, the Partnership included two other members in addition to the Debtor:  Alliant Tax Credit IX, Inc. (as the Administrative Limited

---

[1] "Appellate Record" will be used as the abbreviated term for both the Debtor's Designation of Record and Statement of Issues on Appeal, and Appellee's Counter-Designation of the Record.  Debtor's designations begin with the prefix "D" and Appellee's designations begin with the prefix "A."

3

Partner) and Alliant Tax Credit Fund IX, Ltd. (as the Investor Limited Partner).[2]  (Appellate Record D-3, Ex. A.)

The Partnership acquired the Complex in 2000 and subsequently sold it to the Yonkers Industrial Development Agency ("Yonkers IDA"), which leased it back to the Partnership in a lease agreement dated December 1, 2000.  (Appellate Record D-3, ¶ 9 and Ex. D.)  In order to finance the acquisition and construction of the Complex, the Partnership obtained a $9,697,400 mortgage loan ("Mortgage") from Arbor National Commercial Mortgage, LLC ("Arbor"). (Appellate Record D-3, ¶ 10; D-17, Exs. A-B to Supplemental Declaration of Brian Doran in Support of Alliant's Motions for Relief ("Doran Decl.").)  In connection with this Mortgage, the Yonkers IDA also issued a series of GNMA Collateralized Mortgage Housing Bonds ("GNMA Bonds").  Thus, the Partnership's debt is structured such that the Partnership makes monthly payments on the Mortgage to Arbor, who then uses these mortgage payments to pay the GNMA Bondholders.  The Mortgage is secured by the Complex and insured by the United States Department of Housing and Urban Development ("HUD").  (Appellate Record D-3, ¶ 10.)

### A. The Amended Partnership Agreement

On March 26, 2001, the original three Partnership members and Gary Flocco, President of the Debtor (Appellate Record D-4, ¶ 1), entered into an Amended and Restated Agreement of Limited Partnership ("Partnership Agreement"), with Mr. Flocco listed as the preexisting limited partner.  Under the amended Partnership Agreement, the Debtor assumed responsibility for assuring payment of the Mortgage.  (Appellate Record D-3, Ex. A at §§ 4.2 and 5.2(E).)

---

[2] In June 2001, Alliant Tax Credit IX, Inc. and Alliant Tax Credit Fund IX, Ltd. assigned their respective interests in the Partnership to Alliant Tax Credit XIV, Inc. ("Alliant XIV") and Alliant Tax Credit Fund XIV, Ltd. ("Alliant Fund XIV" or, jointly with Alliant XIV, "Alliant").

In a separate Guaranty Agreement, also dated March 26, 2001, Mr. Flocco and Rodney James Mondello – the sole shareholders and executive officers of the Debtor – and St. Casimir Development Company, LLC (collectively, the "Guarantors") guaranteed several of the Debtor's obligations under the Partnership Agreement, "in order to induce the Investor Limited Partner to enter into the Partnership Agreement."  (Appellate Record D-3, Ex. C.)  Among these guaranteed provisions was Section 4.2, which obligates the General Partner to pay any Development Deficits including the Mortgage.

Under the Partnership Agreement, failure to make monthly Mortgage payments is considered a "Major Default" by the General Partner:

Section 11.4 Special Removal Rights.

A.  Notwithstanding any other provision of this Agreement to the contrary, the following events shall be considered a "Major Default":

(i) Any General Partner . . . shall:

(a) Materially violate its fiduciary responsibilities as a General Partner of the Partnership;

(b) Violate the Completion guaranty set forth in Section 4.1 hereof;

(c) Be in material breach of any provision . . . of this Agreement . . . or any other document for fifteen (15) days after notice thereof has been given . . . ; provided, however, that if such breach is of the type that cannot reasonably be cured within fifteen (15) days, the Administrative Limited Partner shall not have the right to remove a General Partner under this Section 11.4(A)(i)(B) with respect to such breach for a ninety (90) day period after such notice is given so long as such General Partner is diligently pursuing a cure of such breach . . . and accomplishes such cure within such ninety (90) day period;

(d) Willfully violate any law, regulation or order applicable to the Partnership which has or is likely to have a material adverse effect on the Partnership or the Apartment Complex; or

(e) Become Bankrupt . . .

(Appellate Record D-3, Ex. A at § 11.4(A)(i).)  A Major Default also occurs when the Partnership is "in material breach of any Project Document or any other material agreement or document . . . affecting the Partnership, which breach has failed to have been cured within any applicable cure or grace period."  (Id. at § 11.4(A)(ii)(a).)  The Mortgage and its underlying mortgage note are such Project Documents.  (Id. at Art. 1, defining "Project Documents.")

In case of a Major Default, the Partnership Agreement grants Alliant XIV – as the Administrative Limited Partner – the power to remove the Debtor as General Partner:

> Upon a Major Default, the Administrative Limited Partner shall have . . .  the right, but not the obligation, in the sole discretion of the Administrative Limited Partner, upon ten (10) days' prior notice to such General Partner, to remove such General Partner (and, if the Administrative Limited Partner so elects) all other General Partners who are Affiliates of such General Partner and to appoint itself or any of its Affiliates or any other Person to succeed General Partners(s) as a General Partner in accordance with the provisions of Section 11.2 hereof.

(Appellate Record D-3, Ex. A at § 11.4.)  When the Administrative Limited Partner removes the General Partner from the Partnership, the General Partner's rights and interests in the Partnership terminate automatically, though the General Partner remains liable to the Partnership for any past and/or future obligations:

> In the event of . . . the removal of a General Partner pursuant to Section 11.4 . . . the Interest of the General Partner shall immediately and automatically terminate on the effective date of such Withdrawal . . . and such General Partner shall have no further right to participate in the management or operation of the Partnership or to receive any future allocations of Profits and Losses, any distributions from the Partnership or any other funds or assets of the Partnership, nor shall it be entitled to receive or to be paid by the Partnership any further payments of fees . . . or to be paid any outstanding loans made by it to the Partnership.  From and after the effective date of such Withdrawal . . . the rights of such Withdrawing General Partner to receive or be paid such allocations, distributions, funds, assets, fees or repayments shall be reallocated to the other General Partners, or if there is no other General Partner at that time, to the Administrative Limited Partner.

> Notwithstanding such Withdrawal . . . such Withdrawing General Partner shall remain liable to the Partnership and the other Partners for all obligations theretofore incurred by it under this Agreement, or which may arise upon . . . such Withdrawal.

(Appellate Record D-3, Ex. A at §11.1(B).)

The Partnership Agreement prescribes several notice provisions which the Administrative Limited Partner must utilize in order to effect such a removal of the Debtor as General Partner.   § 15.4 of the Partnership Agreement requires the following method of notice for communications between the Debtor (as the General Partner) and Alliant XIV (as the Administrative Limited Partner):

> All notices, demands, solicitations of consent or approval, and other communications hereunder required or permitted shall be in writing and shall be deemed to have been given (i) when personally delivered or telecopied, (ii) one business day after the date when deposited with an overnight courier, or (iii) five (5) days after the date when deposited in the United States mail and sent postage prepaid by registered or certified mail, return receipt requested, addressed as follows:
>
> A.  If to the Partnership and/or the General Partners, to the intended recipient at:
>
> > St. Casimir Development Corp.
> > 294 Bronxville Road, #2H
> > Bronxville, New York 10708
> > Attention: Mr. Gary Flocco
> > Telephone: (914) 395-1180
> > Telecopy: (914) 329-0720
>
> with a copy to:
>
> > Jenkens & Gilchrist Parker Chapin LLP
> > 405 Lexington Avenue
> > New York, New York 10174
> > Attention: Mark A. Limardo, Esq.
> > Telephone: (212) 704-6046
> > Telecopy: (212) 704-6288

7

\*\*\*

C.  If to the Administrative Limited Partner, to the intended recipient at:

      c/o Alliant Asset Management Company LLC
      21550 Oxnard Street, Suite 1020
      Woodland Hills, California 91367
      Attention: Tony Palaigos, Esq.
      Telephone: (818) 668-6800
      Telecopy: (818) 668-2828

with a copy to:

      Riordan & McKinzie
      300 South Grand Avenue, 29th Floor
      Los Angeles, California 90071
      Attention: Lance Bocarsly, Esq.
      Telephone: (213) 229-8454
      Telecopy: (213) 229-8550

(Appellate Record D-3, Ex. A at § 15.4.)

## B.  The Debtor's Mortgage Default and Alliant's Notices of Default and Removal

According to the Debtor's own calculations, the Mortgage has been in some measure of default continuously since June 2004.  (Appellate Record D-16, Ex. 6.)  At the close of March 2005, the outstanding Mortgage balance stood at $185,901.91.  (Id.)  At the close of May 2005, the outstanding balance totaled $246,894.65.  (Id.)  Between May and September 2005, the Mortgage balance grew to $269,295.88.  (Id.)  And by the time oral argument on Alliant's motions took place in the bankruptcy court on April 4, 2006, the balance had ballooned to approximately $560,000.[3]  (Appellate Record A-11 at 2:16-20.)

_____

[3] There appears to be some discrepancy between the amount owed on the Mortgage Note. For example, according to Alliant's moving papers in the bankruptcy court, the amount due on the Mortgage on November 16, 2005 was $593,841.87.  (Appellate Record D-3, Ex. F.) According to the Debtor's figures, the amount due at the close of November 2005 was $453,521.35.  (Appellate Record D-16, Ex. 6.)

In light of these mortgage defaults, Alliant took action to remove the Debtor as the General Partner.  On April 4, 2005, Alliant sent a letter via facsimile and overnight mail to Debtor, notifying Debtor that it was "in Major Default under the Partnership Agreement" and "demand[ing]" that Debtor "take immediate action to cure each and every default listed in the" notice letter "within 15 days," as prescribed by the Agreement ("First Default Notice"). (Appellate Record D-3, Ex. J.)  The First Default Notice alleged three separate Major Defaults by the Debtor, as General Partner: 1) Debtor "is severely delinquent in making its required mortgage payments to [Arbor, which] . . . constitute[s] Development Deficits under Section 4.2 of the Partnership Agreement, which [Debtor] is required to fund, [and] defaults under Section 5.2(E)," 2) Debtor has "failed to submit both preliminary and final drafts of the annual financial statements of the Partnership," and 3) Debtor has "failed to submit to the limited partners the Partnership's tax information for the fiscal year 2004."  (Id.)  In its letter, Alliant asserted that the three alleged violations of the Partnership Agreement each individually constituted Major Defaults, giving Alliant the "right to remove" the Debtor as General Partner.  (Id.)

Ten days later, on April 14, 2005, Alliant sent a second letter via facsimile and overnight mail to Debtor, "notify[ing Debtor] of additional defaults, Major Defaults, and breaches of fiduciary duty committed by [Debtor] under the Partnership Agreement and . . . demand[ing] the immediate cure by [Debtor] . . . and in no event later than 15 days hence" ("Second Default Notice").  (Appellate Record D-3, Ex. K.)  This Second Default Notice alleged the following three new defaults by Debtor: 1) Debtor "has failed to fund a repair and replacement reserve," 2) Debtor "has failed to prepare  . . . an annual budget for the Fiscal Year 2005 by November 1, 2004," and 3) Debtor has failed to provide the certification required by Section 13.3(F) of the

Partnership Agreement, confirming at the close of each quarter that the Partnership has not been cited for any 'Violation' by any governmental entities.  (Id.)  Again, Alliant asserted that each of these alleged defaults individually constituted a Major Default and, therefore, Alliant could remove the Debtor as General Partner.  (Id.)  In this letter, Alliant also specifically noted that it "does not waive any of the matters which are the subject of the First Default Notice."  (Id.)

Neither the Debtor nor the Guarantors cured any of the alleged Major Defaults. Therefore, on April 25, 2005 (which was less than fifteen days after the sending of the Second Default Notice but more than fifteen days after the sending of the First Default Notice), Alliant sent a letter via facsimile and overnight mail to Debtor, notifying Debtor that "none of those defaults" listed in the First Default Notice had been cured.  The letter concluded: "Accordingly, pursuant to section 11.4(A) of the Partnership Agreement, this letter shall constitute ten (10) days' prior notice to [Debtor] of Alliant's decision to remove [Debtor] as the General Partner of the Partnership and to appoint itself or any of its Affiliates . . . to succeed St. Casimir as a General Partner." ("Ten Day Notice of Intent to Remove").  (Appellate Record D-3, Ex. L.)  In this Ten Day Notice of Intent to Remove, Alliant expressly reserved all of its rights under the Second Default Notice dated April 14, 2005 (which, because fifteen days had not yet passed, could not yet be deemed "Major Defaults").

Debtor concedes that the First and Second Default Notices, and the Ten Day Notice of Intent to Remove, were properly served in accordance with the Partnership Agreement. (Appellant Br. at 9.)

Shortly after receiving Alliant's Ten Day Notice of Intent to Remove, Debtor allegedly made repeated verbal promises to both Alliant and Arbor that it would immediately pay the

balance due on the Mortgage.  (Appellate Record D-17, Doran Decl. at ¶¶ 23, 27.)

Despite these oral commitments, on May 2, 2005 – three days before the ten day notice of removal would expire – Debtor sent a letter to Alliant in which the Debtor stated that it "respectfully disagrees with the matters set forth in your [Ten Day Notice of Intent to Remove] and denies *inter alia* . . . that there is a Major Default . . . and . . . that the [Debtor] is subject to removal as the General Partner" ("Dispute Letter").  (Appellate Record D-16, Ex. 3.)  The Dispute Letter also contended that any defaults alleged in Alliant's First Default Notice – including failure to pay the mortgage – "could not have been cured reasonably within fifteen days of the date of your letter" and, therefore, Debtor had until ninety days after the First Default Notice to cure any defaults.[4]  (Id.)  In closing, Debtor noted that "Mr. Flocco hopes to resolve any disagreements with respect to the matters set forth in [the Ten Day Notice of Intent to Remove] in an amicable, orderly and timely manner."  (Id.)  This letter was sent via facsimile to Samuel L. Barkin, Alliant's attorney at Heller, Ehrman, White & McAuliffe LLP, and copied to Mark Limardo, bond counsel, and was therefore not served in accordance with the notice provision of the Partnership Agreement.

On May 4, 2005 – one day before the expiration of the ten day period – in apparent reliance on the Debtor's oral representations that it would pay the Mortgage balance immediately, Alliant agreed to forbear from removing the Debtor as General Partner so that the Debtor could have an opportunity to pay the mortgage balance:

Given your recent discussions with Arbor . . . regarding your intent to

---

[4] Although not at issue in this appeal, the court disagrees with the Debtor.  The payment of money is the sort of default that could be remedied within fifteen days – in contrast to, for example, the completion of a major physical repair.

> immediately pay all amounts due under the Mortgage Note . . . *Alliant hereby agrees to defer the date of Removal to such date as specified by the delivery of a subsequent letter confirming such Removal.*  This provides [Debtor] ample opportunity to fulfill the representation you personally made on May 2, 2005 to bring the mortgage payments due to Arbor current immediately.

(Appellate Record D-3, Ex. M) (emphasis added).  In other words, Alliant said that it would not lower the boom immediately upon the expiration of the ten day period (which was due to expire the next day), but would give Debtor some more time to make payments.  The parties refer to this letter as the "Tolling Letter," but I will call it the "Forbearance Letter," because the letter does not purport to toll the running of the ten day period provided for giving notice of removal in § 11.4 of the Partnership Agreement.  Nor did the letter waive the Debtor's defaults or expunge the prior notices.  It instead unilaterally "deferred the date of Removal," and did so under an explicit reservation of all "rights and remedies afforded Alliant under the Partnership Agreement and under any and all related agreements, and expressed by Alliant in its letters dated April 4, April 14 and April 25, 2005."  (Id.)  Specifically, Alliant stated that the Forbearance Letter "does not affect Alliant's right to demand that [Debtor] cure the other defaults listed in the three April letters, nor does it affect Alliant's right to remove [Debtor] as General Partner on the basis of such defaults [i.e. the defaults detailed in the April 4 and 14 letters]."  (Id.)

The Forbearance Letter was mailed to Mr. Flocco's apartment in the Bronx by overnight delivery and faxed to Mr. Flocco at a fax number not referenced in the Partnership Agreement.  Alliant also sent copies to Mr. Flocco's individual counsel, Michael Curto, and Mr. Mondello.  (Appellant Br. at 10.)  Alliant did not send the Forbearance Letter either to the Debtor's attention at the Bronxville address or to the bond counsel – Mark Limardo's – attention, in the manner prescribed by § 15.4 of the Partnership Agreement.  Alliant concedes as much.

12

Despite the Debtor's oral assurances to Arbor and Alliant, the Debtor did not cure the Mortgage defaults over the summer.  (Appellate Record D-3, ¶ 35.)

On September 7, 2005, Arbor wrote Flocco – and copied Alliant – to "inform[ him] that as of August 30, 2005, Arbor filed its intention to assign this loan to HUD."  (Appellate Record D-3, Ex. I.)  Shortly thereafter, on September 16, 2005, Alliant wrote Mr. Flocco's individual counsel to inform him that Alliant had elected to cease its forbearance and remove the Debtor as General Partner effective immediately ("Removal Letter").  (Appellate Record D-3, Ex. N.)  This Removal Letter noted the September 7 letter from Arbor, and stated that, "The assignment of the mortgage loan to HUD can lead to grave and irreparable injury to the Partnership."  (Id.)  The letter further stated that, aside from the Debtor's preparation of the 2005 fiscal budget, none of the other five Major Defaults delineated in the First and Second Default Notices had been cured. (Id.)  Accordingly, Alliant "hereby removes, effective today, [Debtor] as General Partner of the Partnership and appoints Alliant Holdings of St. Casimir, LLC to succeed [Debtor] as a General Partner."  (Id.)

Alliant sent this Removal Letter only to Mr. Flocco's individual counsel, Michael Curto, and Mr. Mondello.  Alliant did not send the Removal Letter either to the Debtor's attention or to the bond counsel – Mark Limardo's – attention, in the manner prescribed by § 15.4 of the Partnership Agreement.  Again, Alliant concedes as much.

Five days later, on September 21, 2005, Alliant filed a complaint in this court, seeking the removal of the Debtor as General Partner via court order.  See Alliant Tax Credit XIV, Inc. v. St. Casimir Dev. Corp., No 05-CV-8171 (McMahon, J.) (the "Adversary Proceeding") (Appellate Record A-12).  Two days later, on September 23, 2005, the Debtor filed its voluntary

Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Southern District

of New York.  (Appellate Record D-1.)  On the same day as it filed its bankruptcy petition, the

Debtor also requested that this court transfer the Adversary Proceeding to the bankruptcy court,

pursuant to 28 U.S.C. § 157(a).  (No. 05-CV-8171, Docket Entry No. 3.)  On September 28,

2005, I granted the request and referred the Adversary Proceeding to the bankruptcy court.  (Id.)

### C.  *Alliant's Motions for an Order Lifting the Automatic Stay and Removing the Debtor as General Partner*

On December 21, 2005, Alliant filed two motions for relief.  The first, filed in the

bankruptcy proceeding, sought relief from the automatic stay pursuant to §§ 362(d)(1) and (2)

and Fed. R. Bankr. P. 7065.  The second, filed in the related Adversary Proceeding, sought the

removal of the Debtor as General Partner via injunctive relief.  (Appellate Record D-2, D-37.)

In its moving papers, Alliant argued that the Debtor had no equity in the Partnership because

Alliant had validly terminated the Debtor's interest and removed the Debtor as General Partner

prior to the Debtor's bankruptcy petition.  Moreover, because the Debtor's interest had

terminated pre-petition, the Partnership Agreement was no longer an assumable contract under

11 U.S.C. § 365 and, therefore, the general partnership interest the Debtor once possessed was

no longer necessary to the Debtor's effective reorganization.

The Debtor opposed the motions, arguing that it was not in default, that Alliant

improperly served the notices of default and removal on Debtor, and that Alliant's interest was

adequately protected in the bankruptcy proceeding.  (Appellate Record D-16.)

On April 4, 2006, at the close of the third hearing between these parties before U.S.

Bankruptcy Judge Adlai Hardin, the court granted Alliant's motions and issued the following

relevant findings of fact:

> FOUND, that from at least April 2005 through the Petition Date, the Debtor was in Major Default under the Partnership Agreement by its failure to timely make the payments due under the Mortgage;
>
> FOUND, the Debtor's alleged defenses to its failure to pay the Mortgage are found to be without basis and are hereby overruled;
>
> FOUND, that by letter dated April 4, 2005, Alliant properly served notice of the Major Default and the applicable 15 day cure period upon the Debtor . . . ;
>
> FOUND, that the applicable cure period under the Partnership Agreement is a 15 rather than 90 day period . . . ;
>
> FOUND, that the Debtor did not cure the Major Default identified within the applicable 15 day cure period identified in the Cure Notice . . . . ;
>
> FOUND, that in the absence of a timely cure, Alliant properly served its 10 day notice of the removal of the Debtor as managing general partner of the Partnership and termination of its general partner interest by letter dated April 25, 2005;
>
> FOUND, that the Alliant's unilateral forbearance from exercising its removal right under the Removal Notice as stated in its May 4, 2005 letter did not invalidate either the Cure Notice or the Removal Notice or trigger a new notice period;
>
> FOUND, that Alliant properly removed the Debtor by letter dated September 16, 2005; which is to become effective as of the date of this order.
>
> FOUND, that Alliant properly terminated the Debtor's Partnership interest and it is not subject to being assumed pursuant to 11 U.S.C. § 365.

(Appellate Record D-33.)  In light of these findings, the court granted Alliant relief from the automatic stay as well as the requested injunctive relief, "as necessary to gain control of the Partnership assets and affairs."  (Id.)  The court further directed Debtor to 1) turn over all Partnership property, books and records to the succeeding general partner, 2) "undo any actions taken by the Debtor after issuance of the Removal Notice on behalf of the Partnership," 3) cooperate with any management company selected by the succeeding general partner, 4) not

interfere with employees hired by the management company, and 5) not interfere with the succeeding general partner's management of the Partnership. (Id.)

The Debtor filed a timely notice of appeal on June 13, 2006. (Appellate Record D-34.)

### III.  Standard of Review

This court reviews the bankruptcy court's conclusions of law *de novo*, and its findings of fact for clear error. In re Stoltz, 315 F.3d 80, 87 (2d Cir. 2002); Fed R. Bankr. P. 8013. Mixed questions of law and fact will be reviewed *de novo*. Prima U.S. Inc. v. Panalpina, Inc., 223 F.3d 126, 129 (2d Cir. 2000). The question of whether Alliant's Forbearance Letter waived its right to terminate the Debtor's partnership interest pursuant to the First Default Notice and Ten Day Notice of Intent to Remove constitutes a mixed question of law and fact and will therefore be reviewed *de novo*.

### IV.  Discussion

#### A.  The Forbearance Letter Did Not Invalidate the Efficacy of Alliant's Notices of Default and Ten Day Notice of Intent to Remove, but Alliant Improperly Served the Subsequent Removal Letter

The Debtor's primary argument for denying Alliant's motions for relief from the § 362(d) automatic stay and related injunctive relief in the adversary proceeding, is that Alliant's notices of default and intent to remove "fail[ed] to comply with the specific noticing requirements of the Partnership Agreement." (Appellant Br. at 12.) Although the Debtor concedes that the First and Second Default Notices and the Ten Day Notice of Intent to Remove were served in accordance with the Partnership Agreement, the Debtor contends that the Forbearance Letter effected an "improper and unilateral suspension" of the removal process begun by the First and Second Default Notices and the Ten Day Notice of Intent to Remove, and required Alliant to begin the

16

process anew.  (Appellant Br. at 15-16, 21-22.)  According to the Debtor, the Forbearance Letter

"withdrew the Notice of Removal."  (Id.)  Moreover, the Debtor argues that both the

Forbearance Letter and Removal Letter are themselves of no effect, because Alliant did not serve

them in the manner prescribed by the Partnership Agreement.  (Appellant Br. at 16.)

The Debtor further claims that Alliant's Removal Letter – which removed Debtor as

General Partner effective immediately – prejudiced Debtor in two ways.  First, because the

Debtor's removal was made effective immediately, the Debtor's bond counsel "was not alerted

to the poising of a 'sword of Damocles' in such a manner as to afford 1½ days of time [i.e. the

amount of time remaining in the ten day notice period when the Forbearance Letter was sent] to

take action." (Appellant Br. at 10.)  Second, the Debtor "was severely prejudiced inasmuch as

there was no time to mount a legal challenge in the manner presented by the service by

Appellant of the Dispute Letter."  (Reply Br. at 8.)

In support of these contentions, the Debtor cites § 15.4 of the Partnership Agreement,

which requires, "All notices, demands, solicitations of consent or approval and other

communications hereunder required or permitted shall be in writing" and must be sent by hand

delivery, fax, regular mail, or overnight mail to the Debtor at its Bronxville address and copied

to the bond counsel.  (Appellate Record D-3, Ex. A at § 15.4.)  The Debtor relies on Dale v.

Industrial Ceramics, Inc., 571 N.Y.S.2d 185 (Sup. Ct. N.Y. Cty. 1991), for the proposition that,

under New York law, "notice provisions as set forth in the Partnership Agreement must be

complied with literally."  (Appellant Br. at 14.)

1.  Alliant's Forbearance Letter was Properly Served and Does Not Alter the Efficacy of
the First and Second Default Notices and Ten Day Notice of Intent to Remove

The Debtor concedes that the First and Second Default Notices and the Ten Day Notice

of Intent to Remove complied strictly with the Partnership Agreement's notice provisions.  That

being so, Alliant had the right to remove the Debtor as General Partner.  The Agreement requires

Alliant to give the Debtor fifteen days to cure the alleged default.  If the default is not cured,

Alliant must give the Debtor ten days notice that Alliant plans to remove the Debtor as General

Partner.  Once that ten day notice period ended, as Judge Hardin correctly recognized, Alliant

was free to remove the Debtor as General Partner at Alliant's discretion.  The ten days elapsed

on May 5, 2006.  Prior to that date, the Debtor did not obtain a court order tolling the ten day

period, and Alliant did not agree to toll the running of the ten day period.  Alliant simply agreed

to forbear from exercising its undoubted right to remove the Debtor immediately upon the

expiration of the ten day notice period, without prejudice to the exercise of its rights under, *inter

alia*, the Ten Day Notice of Intent to Remove.  Indeed, the Forbearance Letter itself made clear

that Alliant was not tolling the ten day notice period.  The letter said that Alliant would "*defer

the date of Removal* to such date as specified by the delivery of a subsequent letter confirming

such Removal."  (Appellate Record D-3, Ex. M) (emphasis added.)

The issue, therefore, is not whether these initial notices were properly served and

effective – they were – but whether the Forbearance Letter cancelled the effectiveness of these

notices or constituted a waiver of Alliant's right to remove Debtor as General Partner.  On this

mixed question of law and fact, the bankruptcy court's finding was unambiguous:

> The notices necessary to accomplish [removal of the Debtor] complied
> completely with the precise requirements of the partnership agreement.  It is true
> that nothing in the partnership agreement expressly provides that Alliant has the
> right to defer the actual removal of the debtor but the agreement does make very
> clear that the debtor has the right but not the obligation to remove the debtor and
> nothing in the agreement states that the removal must take place on the tenth day
> following the ten day notice or on the eleventh day or on the 211th day following
> the ten day notice.  It is quite clear under the terms of the agreement which makes

the removal at the auction [sic] of Alliant that Alliant has the right to either
remove on the tenth day or any day thereafter so long as it has complied with the
precise requirements of the fifteen day notice of default and the ten day notice of
removal.  Both notices were sent in absolute complete compliance.

In response to the pleading of Mr. Flocco and his colleagues, counsel, Alliant
expressed its willingness to forbear from removal, from the actual removal but not
its waiver of the right to remove.  Had there been a cure after the ten day notice at
any time prior to the September 16 letter . . . then and only then could one say that
the fifteen day notice and the ten day notice were no longer operative but it is
perfectly clear that there was no cure at all.  The debt simply grew and grew.

(Appellate Record A-11 at 53:13-54:12.)

Reviewing this question *de novo,* I see no error in the learned bankruptcy judge's

holding.  The Forbearance Letter quite plainly does not withdraw either the First Default Notice

or Ten Day Notice of Intent to Remove and require Alliant to begin the removal process from

scratch.  By its terms, the Forbearance Letter expressly reserves all "rights and remedies afforded

Alliant under the Partnership Agreement and under any and all related agreements, and

expressed by Alliant in its letters dated April 4, April 14 and April 25, 2005."  (Appellate Record

D-3, Ex. M.)  The Forbearance Letter further states that it "does not affect Alliant's right to

demand that [Debtor] cure the other defaults listed in the three April letters, nor does it affect

Alliant's right to remove [Debtor] as General Partner on the basis of such defaults."  (Id.)  Thus,

the Debtor was on notice that Alliant offered nothing more than a temporary forbearance of its

undisputed and fully ripened right to remove the Debtor as General Partner after the ten day

notice period expired on May 5, 2005.  That forbearance worked no waiver of anything that had

gone before.  Nothing in the record indicates that the Debtor objected to Alliant's assertion of

this continued right.  Indeed, Alliant's forbearance offered the Debtor a benefit – the benefit of

continuing to act as General Partner of the partnership –  of which the Debtor took full

19

advantage.

The text of the Partnership Agreement supports the notion that Alliant could unilaterally forbear from removing the Debtor as the General Partner, without waiving its removal rights. Nothing in the Agreement forbids Alliant from giving the Debtor extra time to cure a Major Default, or from forbearing from exercising its removal rights.  On the contrary, the Partnership Agreement states that Alliant has "the right, *but not the obligation*" to remove the Debtor as General Partner after giving ten days' notice.  (Appellate Record D-3, Ex. A at § 15.4.)  Again, the record indicates that the Debtor was more than happy to receive this additional time and did not challenge the Forbearance Letter's explicit conditions for granting additional time.  Such unilateral forbearance, especially when accompanied by an express statement that the forbearance was not intended to work a waiver, does not operate as a waiver of Alliant's rights to remove the Debtor as General Partner any time beginning May 6, 2005.  The Forbearance Letter did not stop the running of the ten day period; the letter merely gave the Debtor an additional grace period that the Partnership Agreement did not prohibit.

The cases cited by the Debtor do not state otherwise.  Indeed, the Debtor's cases fail to address the issue of whether the Forbearance Letter worked a waiver of Alliant's right to remove the Debtor as General Partner pursuant to the notices of default and removal that had already been sent.

Instead of addressing this issue, the Debtor relies heavily on <u>Dale</u> for the proposition that parties must strictly comply with a contract's notice provisions.  I do not argue with that point of law (and, as will be seen below, it works to Debtor's benefit in the long run).  But rather than buttressing the Debtor's argument, <u>Dale</u> actually supports Alliant's position on the issue of

waiver.

In <u>Dale</u>, the court addressed whether the lender's failure to send a default notice in accordance with a promissory note's service provisions should stop the note's acceleration clause from taking effect.  The court answered this question affirmatively, holding that parties must strictly comply with default notice provisions because, "It is the purpose of the default notice to give the borrower one final chance to avoid default."  <u>Dale</u>, 571 N.Y.S.2d at 186.

Here, the Debtor had not one final chance, but two final chances.  Nobody disputes that Alliant properly served two separate default notices, notifying Debtor that it had fifteen days to cure its numerous Major Defaults.  (Appellate Record D-3, Exs. J-K; Appellant Br. at 9.)  After the first fifteen day cure period expired, Alliant sent the ten day notice letter, starting the period preceding removal.  Alliant's Forbearance Letter gave the Debtor a second chance to cure, but did so without prejudice to Alliant's right to finish the process it had already set in motion.  It is not possible to read the Forbearance Letter as suggesting that Debtor's default had been excused; the language of the letter makes it clear that the opposite is true.  (Appellate Record D-17, Doran Decl. at ¶ 27.)  Therefore, <u>Dale</u>'s flowery language regarding the "sword of Damocles" – which the Debtor sprinkles liberally throughout its papers – does not apply to the case at bar because the Debtor was given multiple opportunities to cure its defaults.

The other cases cited by the Debtor discussing the necessity of strict compliance with a variety of contract provisions are no more persuasive on the issue of waiver.

Thus, the bankruptcy court correctly found that "Alliant's unilateral forbearance from exercising its removal right under the Ten Day Removal Notice as stated in its May 4, 2005 letter did not invalidate either the Cure Notice or the Ten Day Removal Notice or trigger a new

notice period." (Appellate Record D-33.)

     2.  Notwithstanding the Above, the Debtor was Not Properly Removed as General Partner

Despite the foregoing, the learned bankruptcy judge's decision must be reversed because Alliant failed to remove the Debtor as General Partner.

There are two separate aspects to this analysis. The first is whether, under the Partnership Agreement, Alliant had to take any additional step to remove the Debtor as General Partner once the ten day period expired, or whether that removal occurred automatically after the expiration of the ten day period. Because the Partnership Agreement's removal scheme works as a condition subsequent, rather than a conditional limitation, I conclude that Alliant was required to send an additional notice to the Debtor after the ten day notice of removal period expired in order to effect the Debtor's removal.

The difference between conditions subsequent and conditional limitations has confounded generations of lawyers and law students. Generally speaking, if a clause in a contract provides that the contract will end at the moment a particular designated event happens, that clause creates a conditional limitation. Upon the occurrence of the contingency, the contract automatically expires; it cannot be resurrected by action of the parties. See TSS-Seedman's, Inc. v. Elota Realty Co., 72 N.Y.2d 1024, 1026-27 (N.Y. 1988). The classic New York example is found in commercial landlord-tenant law, when a lease provides as follows:

> In the event of a breach the landlord, may, if the landlord so elects terminate the lease by giving five days' notice in writing of its intention to do so and this lease and the term hereof shall expire and come to an end on the date fixed in such notice as if the said date were the date originally fixed in this lease for the expiration hereof.

22

Perrotta v. Western Regional Off-Track Betting Corp., 469 N.Y.S.2d 504, 506 (4th Dep't 1983).

Once the five days' notice is sent, the lease automatically expires at the end of the fifth day,

unless one of three things happens: the landlord withdraws the notice; the parties agree to toll the

running of the five day period; or a court intervenes and enjoins the running of the five days.

Thus, a clause in a contract works a conditional limitation if it provides that, in the event a notice

of default is sent, the contract will automatically expire on the termination date fixed in the

notice without the need for any further action by any party.  See Ranalli v. Burns, 550 N.Y.S.2d

192, 194 (3d Dep't 1990).

By contrast, where a party has the option either to terminate the contract upon the

occurrence of an event or not to terminate – and where the contract does not expire by its own

limitation upon such occurrence – then the contract contains a condition subsequent.  Under a

condition subsequent, termination of the contract is not "self-executing" when some triggering

even occurs; rather, the person who wishes to terminate the contract must perform some

additional act in order to terminate the contract.  See, e.g., Obedin v. Masiello, 191 N.Y.S.2d

254, 258-59 (Sup. Ct. N.Y. Cty. 1959).  For example (again in the landlord-tenant context),

"Where a lease term provides that a notice terminates the lease upon a specific date, it might well

be construed as a limitation, but where another act is required, i.e., the exercise of the option of

the Landlord to cause such termination, that additional act renders the provision ineffectual as a

limitation.  It is nothing more than a condition subsequent."  Brause v. 2968 Third Ave. Inc., 244

N.Y.S.2d 587, 593 (N.Y.C. Civ. Ct. 1963).

The Partnership Agreement's language makes clear that the agreement's removal

procedure contains a condition subsequent, not a conditional limitation: "Upon a Major Default,

23

*the Administrative Limited Partner shall have . . . the right, but not the obligation*, in the sole discretion of the Administrative Limited Partner, *upon ten (10) days' notice to such General Partner, to remove such General Partner....*"  (Appellate Record D-3, Ex. A at §11.4) (emphasis added).  The wording could not be clearer:  after Alliant serves a ten day notice of intent to remove on the Debtor – and ten days pass – Alliant has the right to remove the General Partner but does not have to exercise that right.  Thus, under the scheme contemplated by the Partnership Agreement, Alliant must serve a ten day notice of intent to remove, wait for the ten days to pass, and then exercise its right (which it has no obligation to exercise) to remove the Debtor from its position, in order to effect the removal.  The scheme devised by the parties is a classic example of a condition subsequent.  See In re Emilio Cavallini, Ltd., 112 B.R. 73, 76 (Bankr. S.D.N.Y. 1990) ("[W]here the lease provision gave the landlord an option and an election by the landlord was necessary to terminate the lease, the term was not void but voidable and the lease only created a condition subsequent.")

If the parties intended to make removal of the General Partner self-executing upon the expiration of the ten day notice, they could have drafted the Partnership Agreement to include some version of the standard phrasing – typically found in commercial leases  – that is quoted above.  Absent a provision that approximates these "magic words," the Partnership Agreement cannot be read to work the automatic removal of the General Partner upon the expiration of ten days following the transmission of the Ten Day Notice of Intent to Remove.

Thus, contrary to Alliant's argument, the Partnership Agreement does require something to happen after the sending of a Ten Day Notice of Intent to Remove in order to effect the Debtor's actual removal.  If the Partnership Agreement's removal scheme included a conditional

24

limitation, then removal of the Debtor would have occurred automatically after the ten day notice of intent to remove period elapsed; Alliant could not have "deferred" the date of removal once the ten day period started running except by withdrawing the Ten Day Notice of Intent to Remove or by tolling the running of the ten days.  Alliant did not withdraw the Ten Day Notice of Intent to Remove – in the Forbearance Letter, it expressly reserved all its rights under that notice.  And Alliant (and Judge Hardin) obviously did not understand that it was tolling the running of the ten day period.  If Alliant thought it was tolling the ten day period, it would have been required to start the clock running again (by sending a notice saying, "We have ended our forbearance and the ten day period – which still has two days left to run – is now running again"), and then let the clock run out for another two days, at the end of which time Debtor's tenure as General Partner would have automatically ended.  But that is not what Alliant did.  Not only does the May 4 letter not read like a tolling letter (because, as Judge Hardin correctly found, it uses the language of forbearance, not tolling), but when Alliant finally ran out of patience, it did not "restart the clock," but terminated the Debtor as General Partner effective "immediately" – not two days later!

Consistent with Alliant's behavior, Alliant's counsel took the position at oral argument of this appeal that the ten days had not stopped running, and the only thing that was "deferred" was the announcement that the Debtor was removed as General Partner.  But if an "announcement" was required in order to effect the removal, then the removal was not self-executing upon the expiration of the ten day period – Alliant had to do something more in order to effect the termination.  Which it did.  Alliant sent a letter purporting to terminate Debtor immediately.  This means that, as far as Alliant was concerned, the ten day notice period had already run as of

September 16.  If the language of the Partnership Agreement were at all inconclusive (which I do not believe it is), Alliant's own conduct makes the point that something more than a Ten Day Notice of Intent to Remove was required in order to effect the Debtor's removal.  (I note that, while Judge Hardin did not discuss this issue in terms of conditional limitation versus condition subsequent, his findings clearly reflect an understanding that something had to happen after the running of the ten days in order to effect Debtor's removal; i.e. he found that the contract contained a condition subsequent.)

Because something more than the passage of time was required to effect the Debtor's removal, the question becomes whether the September 16 Removal Letter did the trick.

It is here that New York's stringent rule about complying with the terms of a partnership agreement when sending notices comes into play.  The September 16 letter purporting to remove the Debtor as General Partner immediately was not sent in accordance with the provisions of the Partnership Agreement.  Under New York law, it thus had no effect.

The Partnership's Notice provision (§ 15.4) provides that "all notices, demands, solicitations of consent . . . and other communications hereunder required or permitted" must be sent in accordance with the Agreement's provisions.  (Appellate Record D-3, Ex. A at § 15.4.) The September 16 letter was admittedly not sent either to Mr. Flocco at the Bronxville address or to bond counsel.  Instead, it was sent to Mr. Flocco's individual counsel and Mr. Mondello.  It did not comply with the notice provision.

Alliant claims that it did not have to comply with the notice provision because the September 16 letter was not one of the communications specified in § 15.4.  Alliant is wrong. The September 16 letter notified Debtor that Alliant was severing their existing partnership

relationship, which the Partnership Agreement permitted (but did not require) Alliant to do.

Thus, the letter effecting Debtor's removal as General Partner qualifies as both a "notice" that

Alliant was exercising its right to remove Debtor, and as a "communication[] hereunder required

or permitted." That means the Removal Letter had to be in writing and delivered to the Debtor

at the Bronxville Road address, with a copy to bond counsel.

New York law requires parties to strictly comply with a contract's notice provisions.

Alliant's failure to do so renders its Removal Letter invalid. See Dale, 571 N.Y.S.2d at 186.

Because the Removal Letter was not sent to the proper parties, it is void and of no effect.[5]

Alliant's argument that it should be excused from complying with the notice provision

because the Debtor's retention of counsel meant that there could be no further direct

communication between Alliant and the Debtor pursuant to the Code of Professional

---

[5] There is a separate issue about whether the Forbearance Letter had to comply with the Partnership Agreement's notice provision, because it is undisputed that the letter was not sent to the parties as provided in § 15.4. I conclude that the Forbearance Letter did not have to be transmitted pursuant to §15.4. Clearly, the Forbearance Letter is neither a notice, a demand, a solicitation, nor a required communication. To the extent that the Forbearance Letter is "permitted" by the Partnership Agreement, Judge Hardin correctly found that nothing in the agreement addressed forbearance (either permitting it or disallowing it). Additionally, the record is replete with similarly permissible communications between the parties that did not comply with the Partnership Agreement notice provisions – the Debtor's own Dispute Letter being but one example. (Appellate Record D-17, ¶¶ 23-24; Appellate Record D-16, Ex. 3.) Furthermore, Alliant mailed and faxed the Forbearance Letter to Mr. Flocco, the Debtor's President, and there is no dispute that Mr. Flocco had actual notice of the Forbearance Letter. See Metro. Transp. Auth. v. Cosmopolitan Aviation Corp., 471 N.Y.S.2d 872, 873-74 (2d Dep't 1984) (denying tenant's appeal in holdover proceeding where tenant had received actual notice of default and tenant failed to object to landlord's faulty service of notice until after trial started). The record is clear that Debtor accepted the benefit of Alliance's forbearance. For all of these reasons, the Forbearance Letter was properly served by Alliant. I do not feel the same way about the September 16 letter, which was really a notice severing the parties' partnership relationship.

Responsibility is utterly without merit.  *Alliant* had the right to terminate Debtor; the notice under the Partnership Agreement was a communication from *Alliant*.  Alliant is not its lawyers and is not bound by any Code of Professional Responsibility to refrain from communicating directly with a represented party.

Because Alliant's Removal Letter was not validly sent, the automatic stay remains in effect and prevents Alliant from terminating the Debtor as General Partner today.  It is well-settled that, absent some showing of "cause," courts will not grant a limited partner's motion for relief from the automatic stay in order to remove the Chapter 11 debtor as general partner.  See, e.g., In re Cardinal Indus., Inc., 116 B.R. 964 (Bankr. S.D. Ohio 1990).  Where, as here, the only "cause" shown by Alliant is its sending of a removal letter that failed to comply with the Partnership Agreement's notice provision, the bankruptcy court's granting of relief from the automatic stay was in error.

Similarly, because Alliant has not legally terminated the Debtor as General Partner,  the bankruptcy court erred in granting Alliant any injunctive relief that would effectuate Alliant's invalid removal of the Debtor as General Partner of the Partnership.

The bankruptcy court's June 6, 2006 Order granting Alliant relief from the automatic stay and injunctive relief in the related adversary proceeding is therefore reversed.

**B.  The Debtor May Choose to Assume or Reject the Partnership Agreement under 11 U.S.C. § 365**

Alliant argues that its termination of the Debtor as General Partner renders moot the Debtor's ability to assume the Partnership Agreement under 11 U.S.C. § 365, because § 365

28

cannot revive a terminated contract.[6]  Obviously, in view of the foregoing, that argument fails.

In the alternative, Alliant cites a handful of cases for the proposition that § 365 does not apply – and the Debtor may therefore not assume the Partnership Agreement – because the Debtor's right to cure defaults expired pre-petition.  See, e.g., Moody v. Amoco Oil Co., 734 F.2d 1200, 1212-13 (7th Cir. 1984); In re Anne Cara Oil Co., Inc., 32 B.R. 643, 647-48 (Bankr. D. Mass. 1983).

To be sure, the Debtor's right to cure Major Defaults expired in April 2005.  The First and Second Default Notices, sent by Alliant on April 4 and 14, 2005, gave the Debtor fifteen days to cure the Major Defaults listed in each notice.  Consequently, the Debtor's right to cure the defaults listed in the First and Second Default Notices expired April 19 and 29, 2005, respectively.  From and after that time, Alliant had the absolute right to elect to terminate the Debtor as General Partner.

Alliant is also correct that the existence of the Forbearance Letter does not change this result, because the Forbearance Letter did not establish a new period for the Debtor to cure defaults; rather, as discussed above, the Forbearance Letter expressly stated that it was sent without prejudice to the effect of the prior letters.  (See Appellate Record D-3, Ex. M.)

---

[6] 11 U.S.C. § 365(b)(1) further provides debtors-in-possession additional time to cure any defaults:

> If there has been a default in an executory contract . . . the trustee [or debtor-in-possession] may not assume such contract . . . unless, at the time of assumption of such contract . . . the trustee: (A) cures . . . such default . . . (B) compensates . . . a party other than the debtor to such contract . . . for any actual pecuniary loss to such party resulting from such default; and (C) provides adequate assurance of future performance under such contract . . .

However, in each case on which Alliant relies, the party in Alliant's position had taken the last necessary step to end its relationship with the debtor prior to the debtor's filing in bankruptcy.  For example, in <u>Moody</u>, the debtor entered into a contract with Amoco Oil Company, under which Amoco served as the supplier and franchisor for the debtor's retail petroleum dealerships.  After the debtor's bank notified Amoco that checks given to Amoco by the debtor as payment under the contract would not be honored, Amoco sent the debtor a letter demanding that – pursuant to the contract – the debtor cure the dishonored checks within five days.  <u>Moody</u>, 734 F.2d at 1205-06.  When the debtor failed to cure this default, Amoco mailed a termination notice, noting that the default had not been cured in the requisite period and announcing that – pursuant to federal statute – "cancellation is to become effective ninety days from the date of this letter."  <u>Id</u>.  One day after receiving the termination notices, the debtor filed for Chapter 11 bankruptcy.  <u>Id</u>.

The Seventh Circuit held that these contracts had been effectively terminated pre-petition and were therefore not subject to § 365, because Amoco had taken the last act necessary to work the termination of the contract, prior to the bankruptcy filing:

> If a contract has been terminated pre-bankruptcy, there is nothing left for the debtor to assume.  However, the termination must be complete and not subject to reversal, either under the terms of the contract or under state law....  [H]ere the dealership termination notices were effective prior to debtors' filing in bankruptcy.  The contract gave debtors no right to cure once the termination notices were mailed.  *Amoco did not have to take any further action to terminate the contracts; termination was automatic at the end of ninety days.*  The fact that the termination itself was not effective for ninety days does not affect the result.

<u>Id</u>. at 1212-13 (emphasis added).

Thus, the Seventh Circuit's determination that Amoco had terminated the contract hinged on the existence of two facts: 1) the debtor's right to cure expired when Amoco mailed the

termination notice (pre-petition), and 2) termination was automatic after ninety days and Amoco was not required to send any further communication to effect the termination (i.e. it worked a conditional limitation).  These two facts together made termination of the <u>Moody</u> contract "complete and not subject to reversal."  The other cases cited by Alliant are to the same effect. <u>See</u> <u>In re Benrus Watch Co., Inc.</u>, 13 B.R. 331, 334 (Bankr. S.D.N.Y. 1981) (holding contract was not executory where debtor's cure rights elapsed pre-petition and the bankruptcy filing "did not prevent [contract] termination inasmuch as nothing but the passage of time remained to complete the termination."); <u>In re Margulis</u>, 323 B.R. 130, 134-35 (Bankr. S.D.N.Y. 2005) (holding option was not executory where debtor's cure rights elapsed pre-petition and option terminated post-petition "with the passage of time.").

Unlike Amoco's letter, Alliant's April 25 letter does not say that Debtor's removal as general partner was to become effective ten days after the sending of the letter.  It says, "[T]his letter shall constitute ten (10) days' prior notice to [Debtor] of Alliant's decision to remove [Debtor] as the General Partner of the Partnership and to appoint itself or any of its Affiliates . . . to succeed St. Casimir as a General Partner."  The September 16 letter does terminate (or purport to terminate) Debtor's position, but because of the botched mailing it did not achieve its purpose.

The rest of the cases cited by Alliant pose a different scenario, in which termination notices were also sent pre-petition (and took effect automatically, post-petition), but the debtor's cure rights actually did not expire until after the petition was filed.  Here, courts agree that the contracts are executory at the time the petition is filed, but are divided over whether the contracts remain executory following expiration of the cure period.  <u>Compare</u> <u>Anne Cara Oil Co., Inc.</u>, 32 B.R. at 647-48 (holding contract was executory and assumable under § 365 only until debtor's

cure rights expired, after which contract was no longer executory); with In re Masterworks, Inc., 100 B.R. 149, 151 (Bankr. D. Conn. 1989) (holding contract was executory and assumable under § 365, even after debtor's cure rights expired).

But this case is not like Anne Cara or In re Masterworks because Debtor had no *right* to cure its defaults; that right had expired back in April 2005, after the expiration of the fifteen days.  Alliant had the right to give Debtor more time to cure, and for reasons best known to itself, Alliant exercised its undoubted right to forbear from terminating the Debtor's status as General Partner.  Therefore, it did not take the last and final step of terminating the Partnership Agreement in May 2005.

Alliant unquestionably tried to take that necessary step on September 16, but it failed, because the September 16 letter failed to comply with the Partnership Agreement's requirements for sending "notices" and "communications permitted by this Agreement."  If Alliant had sent the September 16 Removal Letter in accordance with § 15.4, there would be no argument – the Debtor would not be in a position to assume the contract.

And if the April 25 Ten Day Notice of Intent to Remove had worked a conditional limitation – that is, if the mere passage of ten days from the sending of the letter had effected the Debtor's termination as General Partner – then the result would be the same.  But the April 25 Ten Day Notice of Intent to Remove – unlike the termination letters in Moody and Benrus Watch – did not work a conditional limitation; it was merely the final prerequisite to Alliant's exercising its right (but not its obligation) to terminate the relationship after the passage of ten days.  As Judge Hardin noted during oral argument, "Nothing in the agreement states that the removal must take place on the tenth day following the ten day notice or on the eleventh day or

on the 211th day..." (Appellate Record A-11 at 53:19-22.) Although he did not use the language of conditional limitation, Judge Hardin in effect ruled (correctly, in this court's opinion) that the sending of the Ten Day Notice of Intent to Remove on April 25 did not work as a conditional limitation under the terms of the Partnership Agreement. Thus, Alliant's pre-petition actions were *not* "complete and not subject to reversal," when the April 25 notice was sent, and the Debtor remains the General Partner of the limited partnership with Alliant. That this unfortunate result stems from a hyper-technicality about how a notice was sent does not make it less true.

Another recent bankruptcy case in this district provides further support that the Debtor may assume the Partnership Agreement as an executory contract pursuant to § 365 because – even though its right to cure the Major Defaults expired in April 2005 – Alliant could only remove the Debtor through an affirmative post-petition act. See In re Margulis, 323 B.R. 130, 134-35 (Bankr. S.D.N.Y. 2005). In Margulis, an individual entered into an agreement with an insurance company under which the individual was granted an option to pay $140,000 by May 15, 2004, in settlement of the insurance company's contingent claim against the individual for $790,000; if he failed to make the payment when due, he was granted an additional ten days to pay the option price, but the insurance company did not have to provide a notice of default. Two days after failing to meet the May 15 deadline, the individual filed his Chapter 11 petition. Eight days later, the option period expired. When the insurance company subsequently filed a claim for the full $790,000 debt, the individual argued that he should only be liable for the $140,000. The court disagreed, emphasizing that no post-petition action was needed from the insurance company to terminate the option:

> [T]he automatic stay does not . . . stop a contract from terminating by its own
> terms as long as the termination does not depend on a post-petition "act."

\*\*\*

The effectiveness of the termination does not depend on the timing of the default but on whether termination requires an act prohibited by the automatic stay.

\*\*\*

[T]he issue must be whether termination requires the non-debtor party to undertake some post-petition affirmative act.... *When termination of the contract requires an affirmative act of the non-debtor party, the contract remains executory because such an act is stayed under 11 U.S.C. § 362(a).  When termination occurs without any action by the non-debtor party, the contract is no longer executory and no longer subject to assumption or rejection.*

Id. at 134-35 (emphasis added).  As discussed above, the Partnership Agreement clearly required Alliant to undertake a three-step removal procedure in order to remove the Debtor as General Partner: 1) a fifteen day notice of default, 2) a ten day notice of intent to remove, and 3) a final notice of removal.  Two of these steps occurred prior to the Debtor's Chapter 11 bankruptcy petition.  The last one did not.  Because the final removal letter constitutes "an affirmative act of the non-debtor party," which is prohibited by the automatic stay, the Partnership Agreement remains executory.  Id.

New York partnership law provides no relief for Alliant.  Rather, New York law enforces the terms of partnership agreements by providing that an entity ceases to be a general partner of a limited partnership when "the general partner is removed as a general partner *as may be provided in the partnership agreement*."  N.Y. Partnership Law § 121-402(c) (McKinney 2006) (emphasis added).  As discussed above at length, the Debtor has not been removed as the General Partner in accordance with the Partnership Agreement.

Therefore, because Alliant needed to take some additional affirmative action to effect the removal of the Debtor as General Partner and because Alliant's effort to take that action pre-

34

*in the partnership agreement.*"  N.Y. Partnership Law § 121-402(c) (McKinney 2006) (emphasis added).  As discussed above at length, the Debtor has not been removed as the General Partner in accordance with the Partnership Agreement.

Therefore, because Alliant needed to take some additional affirmative action to effect the removal of the Debtor as General Partner and because Alliant's effort to take that action pre-petition was ineffective as a matter of law, the Debtor was never removed as General Partner. Consequently, the Debtor may choose to assume or reject the Partnership Agreement under § 365.

## V.  Conclusion

For the foregoing reasons, the court reverses the bankruptcy court's granting of Alliant's motion for relief from the automatic stay in the Debtor's bankruptcy proceeding, and the bankruptcy court's granting of Alliant's motion for injunctive relief in the related adversary proceeding to effectuate Alliant's pre-petition removal of the Debtor as General Partner of the Partnership.

This constitutes the decision and order of the court.

Dated: January 11, 2007

_____

U.S.D.J.

BY FAX TO ALL COUNSEL